We're certainly glad to have you here today. For the benefit of those who have not argued here before, we have that lighting system when the yellow light comes on. You need to pay attention to that because that means you have two minutes to wind up your argument. These arguments are being recorded, and if you get away from the podium, we lose your voice, so you need to stay right behind the podium while you're making your argument. And these arguments are available to the public, so you need to use your best and most authoritative voice when you're speaking. The other thing, as I mentioned, is that rebuttal is for rebuttal only, and we don't expect you to bring up any new arguments in rebuttal that have not previously been addressed either by you or your opponent. With that, we'll call the first case of the day, and that's United States v. Thomas William Malone, consolidated with the United States v. Drew T. Green, and Mr. Sadao for Mr. Malone. We'll hear from you. May it please the Court. If I could set the stage, we're talking about an analog substance that was not specifically controlled at the time of the events in the indictment. It was made an analog by federal law. Upon recognizing that Mr. Malone had been indicted, he immediately began to cooperate, and cooperated on an almost full-time basis for approximately two years on cases across the United States. He agreed that there were 1,400 kilos of what's analog substance AM-2201. We knew going in the issue was going to be a conversion ratio, so that the Court understands what we're talking about. The conversion ratio being 1 to 167, 1,400 kilos of AM-2201, using that conversion ratio, would be 250 tons of marijuana. That's a lot. That's a lot. We filed motions for defense sentencing issues. We filed motion for downward variance on various grounds, including the conversion ratio being totally irrational and arbitrary. We filed substantial assistance cooperation motion under seal, all of which were received by the Court. The government responded to all of those. We responded to the cooperation response of the governments by pointing out that this Court's decision in DeSalle— What should have been the conversion ratio, and on what basis? It should have been 1 to 1 because THC is THC, and THC is the active psychoactive ingredient in marijuana and has the same impact whether or not it is synthetic or whether or not it is in marijuana. It should have been 1 to 1 under many reasons, including the fact that, as this Court has held, animal studies are usually considered basically useless in determining whether or not reliable information exists, and that's essentially where the trial judge was on this. What does 167 to 1 mean? It doesn't mean that the substance possessed by your client was 167 times stronger than marijuana, does it? To be honest with you, I think that's what the sentencing guidelines are suggestive of. But this conversion ratio of 1 to 167— That doesn't mean that your client should be sentenced to 167 years when somebody who's possessing marijuana is sentenced to 1 year. That's not what 167 to 1 means, is it? No, not in that sense. I would agree. But what it does mean—I'm sorry. What it means here is, to be perfectly statistical, what it means here is that the offense level became 38, which is the highest drug offense level, with a starting base offense of 235 to 293 months, versus if it had been 1 to 1 as marijuana, it would have been 97 to 121 months. So an 11.5-year difference in the bottom of the guideline is what it means practically, that you're looking at twice as much of an initial guideline calculation based on a 1 to 167 ratio. That's what it means in a statistically and practical effect under the guidelines. How did the government reach 167 to 1? I mean, how does that—what is the source of that figure? That's a question that no one, and I read no one, can answer. It was in the very first guideline, back on November 1st of 1987, when all of us were just getting started in the sense of figuring out what these guidelines mean. There is no legislative history. There is no commentary. There's no nothing. It just appears, and it never changes from November 1 of 1987 to the present day. That's the conversion ratio from THC to marijuana that's set out in the conversion table, isn't it? Correct. Marijuana to synthetic THC. Yeah, I think it prescribes a 1 to 167 ratio for converting THC to marijuana. The question here is whether this particular AM 2201 is really most closely analogous to that particular THC, and that's where I thought that the experts were dueling over. You're absolutely correct, Your Honor. That's where experts duel. Your challenge then is really to that particular guideline statement. That is not a guideline statement, but the conversion factors that are set out in the law. It's twofold, and I would agree. What I'm suggesting to you is that that 1 to 167 is not a judicial formulation, that's a statute of congressional . . . It's been arrived at through the sentencing guidelines process of the rules as to the conversion factor for that particular drug. That's correct, and the point I was making is . . . The problem is that the experts are not . . . The district court has concluded that, persuaded by the experts, that this is really the basic drug of THC. That's correct, and what I was making . . . But are you arguing that . . . I thought your argument was with the analogy that this is not THC, that my client's AM-2-2201 is not THC, and that we shouldn't be facing a 167 to 1 conversion ratio. I think it's a bit more subtle than that. The argument is the active, psychoactive ingredient in marijuana is THC. That's what makes marijuana marijuana. It's the euphoric effect of marijuana. That THC is precisely the same THC that is mentioned in the guidelines as referenced as synthetic THC. There is no difference. It is simply THC. We're not talking about cocaine and marijuana or heroin and marijuana. You're talking about THC being the active ingredient. There is no basis, scientific or otherwise, no commentary, no nothing, that references why THC in so-called synthetic form is 1 to 167 in the conversion ratio to marijuana since it is the same active ingredient. That's the essence of the argument. What the district court is faced with is substance not listed in the drug quantity table, or it's not listed in the drug equivalency table, and so he or she is directed to follow the process they did, right? That is the directive, but that directive has to take into account the absurdity of the result in dealing with the rule of lenity as well, which is, and the court below said this, I've got to make a choice. So if I've got to make a choice, I'm going to go with synthetic because synthetic is more like synthetic AM2201. I think we get down to the depth of the problem. Is this determined by the chemical equivalency analysis or a normative judgment that that's just damn wrong? That just doesn't make sense. We're talking about chemical content. Is this particular product you're making, the chemistry, you don't need chemistry to come in and testify to that if that's your standard. Your fight is over the particular normative standard, I think, if I listen to your argument. Well, we're dealing with the factual determination that the court made as to whether or not it should be THC in marijuana or THC synthetic. That's part of the fight. The second part of the fight is that we moved on multiple occasions for a variance on that particular guideline, and the court never made a determination that it was going to vary or not vary. It just didn't do it. What it said was, I'm not going to throw the guideline out. If you go to that specific part of the ---- I think that's a stronger point than your first one. I don't disagree with that. I'm going to get to it then. I will, Your Honor. If the court goes to the transcript, it is clear. All the court winds up saying is, I find the conversion ratio to be 1 to 167. I'm not throwing out that guideline. I'm done with that. I'm moving on. No discussion of variance or policy or anything to do with the rationale. The court just says, I'm not throwing it out and moves on. There's no recognition by the district court that it has the power to vary. It doesn't speak of variance. It speaks of Kimbrough, but it reads Kimbrough entirely wrong. It thinks Kimbrough is talking in terms of, it has to be between two different drugs, which it really wasn't. It was crack and crack cocaine. I mean, it was cocaine and crack in Kimbrough. Ours is the same substance, THC. I think the record is clear that the court did not make a determination based on its understanding that it could, in fact, vary. Okay. Tell me again the error the district court made in reading Kimbrough. It read Kimbrough as saying that the Supreme Court . . . Fully aware of Kimbrough. Of course. But it read it as if the Supreme Court had ruled that Kimbrough was correct because it had to do with different drugs and the conversion ratio. That's not what Kimbrough dealt with at all. Kimbrough said that the district court judge has the authority to make a determination that a given guideline should not be controlling on its face in determining whether a defendant should be sentenced or not. That it is up to the court to determine whether it wants to exercise its discretion based on a myriad of reasons. In Kimbrough, it happened to be the crack-cocaine-to-cocaine ratio. What did the district court say that leads you to the absolute conclusion that it did not understand its power in that connection? Because the district court said, and I quote, indeed the testimony of both the doctors was that there was no scientific or logical reason to have the THC being 1 to 167 ratio to marijuana in the guidelines. The defendants have relied on the Kimbrough case in urging the court to throw out this guideline. Throw out the guideline. No one asked the court to throw out the guideline. We were saying that there should be a variance based on the lack of scientific basis for that guideline and all the other reasons we had set forth in memorandums from all the defendants. This court will not do so. First of all, the sentencing guidelines are the expression of Congress that this is what should be done. That's true, but that's not to suggest in the light of this entire statement that the court believed it had a power to do something about that. And the next statement. The court acknowledges that the ratios in the sentencing guidelines are arbitrary and present a relative, but converting everything to marijuana, they seek to outline the relative harm. In Kimbrough, what the Supreme Court and the court was doing was comparing one ratio for one drug to another ratio for another drug and pointing out the unfairness of those two ratios. In this case, that's not what the defendants have asked us to do. They have simply asked us to throw out the ratio of 1 to 167 based on its arbitrary nature and the court would decline to do so. It misread Kimbrough. It didn't understand its power under Kimbrough. It basically said Congress came with a guideline. I can't do anything about it. Kimbrough's different. It had to do with two different drugs. Your case has to do with the same drug or the same active ingredient, and therefore I don't have the power to do it. And then... No, she didn't say that. I have, Your Honor. I've saved three minutes for rebuttals. Thank you, Mr. Syra. Mr. Monis? Monis. Mr. Monis, you have four minutes. Thank you. Representing Drew Green. That's correct. May it please the Court, I'm Stuart Monis. I represent Drew Green, the Consolidated Appeal. We've adopted much of Mr. Sadow's brief on behalf of Mr. Malone, and if it's okay with the Court, I want to confine my argument to the rule of lenity and some of the issues around the DeSalle issue concerning Mr. Green. Your Honor, the rule of lenity at its core is about clarity. We do not want to punish someone when it is not clear that their conduct is punishable.  And in this case, as Mr. Sadow touched on, we're dealing at first with a substance that was not itself illegal but was deemed to be an analog of a controlled substance, which was not itself made illegal by Congress but was an emergency listing by the DEA. So we have that issue first. But that's not really the issue we're talking about. The issue we're talking about is how to punish that. Then we get to sentencing, and we have this substance, which is an analog of an emergency-listed substance, and we have to figure out what it is most similar to and how to punish that. And we have an old, unexplained, and unguided 167-to-1 ratio in the guidelines. And as the district court in this case said, there seems to be no rhyme or reason to any of this. That's actually a quote. When the court was looking at it, she said, there's no rhyme or reason to any of these things in the guidelines and how to convert something into something else. Now, much of the guidelines, there is quite a bit of guidance. And this is an emerging problem. The synthetic marijuana issue is an emerging problem. But like most problems that evolve quickly, the solutions have evolved quickly, but not necessarily for the better. We have emergency listings. We have arcane conversion ratios. One-to-one, as Mr. Sadow suggested, is the most appropriate conversion ratio because THC is THC. But the government's expert at the hearing indicated that the THC in synthetic THC is the same thing as the synthetic THC in marijuana, which is a Schedule III substance. And the conversion ratio... I'm sorry, the guideline range for marijuana, the Schedule III substance, would have been far lower, to the order of 10% or 20% of the guideline range when you apply 167 to 1 to the synthetic marijuana. And it is synthetic marijuana, so there is also an alternative conversion ratio that could have been utilized to the court, and it readily reveals itself. This is a product that is converted into marijuana. The process was described by the government's witness, one of the co-defendants, was called by the government to describe the process. 19 parts of plant material, one part of the drug. 20 to 1. This is another conversion ratio that could have been used. The rule of lenity says if there's confusion, which when you have the district court judge saying there's no rhyme or reason to any of this, it certainly indicates confusion. When there's confusion, that should go in the benefit of the defendant. And in this case, Your Honor, 1 to 1 would have been appropriate. Even 20 to 1 would have been appropriate and would slash the sentence significantly. How much? What are we talking about? Well, on 1 to 1, I think that drops prior to cooperation. It drops it to 57 to 71 months, I believe. I think on marijuana, and this is a quick conversion that I did this morning, frankly, Your Honor, I think it would be a level 20 to start, and that would be 18 levels lower than we started out. Okay. Thank you, Mr. Moniz. Thank you, Your Honor. Now we'll hear from the government. Thank you. May it please the Court. I'm Camille Jomang, appearing for the United States. I will begin by addressing first the AM-2201-THC equivalency arguments, because, Judge Higginbotham, as you pointed out, and this is all because, even after Booker, Rita and Gall tell us the district court has to correctly calculate the guidelines in the old way we've done since the guidelines came into existence back in the 80s. And we do that in cases involving analogs by finding the most closely related substance to the analog. So we have to work within the context of the guidelines, and that's the first step. And, Judge Higginbotham, as you pointed out, what the district court was tasked with doing was trying to determine what substance that's already in the guidelines is the most closely related to AM-2201, which is not. And to that end, the court received, as Mr. Sadow mentioned, extensive briefing on this issue from both sides, and then heard all day long a full day of testimony, primarily from two different expert witnesses, a DEA pharmacologist, a chemist pharmacologist, and then the defense expert, who is, I believe, affiliated with the university. And they both presented testimony to the district court, and the district court ultimately looked at four things, a binding assay, a functional assay, in vivo studies performed on trained rats, all very interesting, and then fourth, these sort of reports from people, human beings, who had actually used AM-2201 and who had experienced some of the side effects. And so based on... After hearing all of this evidence, the district court says, you know, I agree with the government's expert, Dr Treke, who has testified that AM-2201 is the most closely related substance to THC. And one of the things that the district court specifically addressed was the defendant's, plural, the defendant's argument that, well, you know, actually it should be marijuana. And the court says, you know, this is illogical, because you can't compare a single chemical, AM-2201, to marijuana, which is an organic, leafy green substance that contains many chemicals. And, in fact, the expert testimony at the hearing was that marijuana, the organic plant that's grown and smoked by people, contains between 60 and 80 different cannabinoids. And the cannabinoid is the type of substance that produces this effect. You know, like AM-2201 is a synthetic cannabinoid, THC is a synthetic... or synthetic THC is a synthetic cannabinoid. So it contains... marijuana contains between 60 and 80. It contains 300 different compounds. Some of the cannabinoids actually mediate the effects of the THC. And this makes the organic plant, the leafy green marijuana, very different from the sole, stand-alone chemical, AM-2201. And that's one of many reasons that the court ultimately adopted the equivalency between the AM-2201 and the THC. Now, once the court makes that factual finding, which I would suggest, and I've argued in my brief, is entitled to deference on appeal, because it is, at bottom, a credibility determination and a factual finding by the court. Once you get to that factual finding, then the guidelines supply the 1 to 167 ratio. And to answer your question, Judge Jolly, I think what that means is that 1 gram of pure THC, because that's the equivalent, so 1 gram of pure THC is about as serious as 167 grams of the leafy green stuff that people buy and smoke. And as the district court pointed out, what those guideline equivalencies do... You know, sometimes, in many instances, we have to convert everything to marijuana. If you have a case where a defendant only has crack cocaine and crack is on the guideline of the quantity tables, we don't have to convert to marijuana. But we have to convert to marijuana if a defendant possesses more than one type of drug. So if a guy has marijuana, crack and ecstasy, then we convert everything to marijuana, because we need a common denominator. You know, that's 7th grade math, or 4th grade math, probably now. We need a common denominator. What is the analog? What's the equivalency? 1 to 200 is cocaine. And in the hearing, the district judge specifically... As serious as cocaine. 167 versus 200. Well, again, Judge, remember, we're talking about the pure THC. We're not talking about marijuana in the leafy plant that has all the other stuff in it. But I guess to answer your question, the sentencing commission believed that pure THC, in its pure synthetic form, the cannabinoid THC, is 200 versus 167, as serious as cocaine. But on that point, during the evidentiary hearing, because the district judge... And this is going to sort of factor into my argument later on how the judge was absolutely aware of her authority under Kimbrough to vary. She allowed the defence to put on evidence about whether these ratios were arbitrary, whether they made any sense. And so there was testimony at the hearing from the defence expert and cross-examination of the government's expert as to what do these ratios mean? Are they arbitrary? Any authority to set aside these ratios is going to have to come from a higher authority than I am. I think what the Court was talking about, Judge, first of all, those comments were made, I believe the ones you're referring to, is where in the early... Before the hearing even starts, before anyone's testified, the judge says, I'm just going to... I'll read it to you. The Court would tell counsel, just so you know how the Court is leaning, that although the Court might be persuaded, the Court is of the mind that the tables in the sentencing guidelines are what they are, and that issue may be an issue for a higher Court. I think what the Court... And you have to sort of read it in context with the Court's later comments. In the middle of the hearing, the Court, while defence counsel, I think Mr. Sado, was examining the witness on the issue of, well, isn't it true that the crack guidelines have changed, the judge interrupts him and says, you know, maybe I'm missing something here. But, you know, this is a different type of ratio because this is the way the guidelines convert everything to the coin of the realm, which is marijuana. And what the Court was talking about, I think, at that point, was how, at some point, when we have to do these conversions to get everything to a common denominator, the guidelines have to make it relative. So, as, Judge, you pointed out, what's cocaine? It's 1 to 200. THC is 1 to 167. Methamphetamine is something else. So it's arbitrary in the sense that it's 167, but it's not arbitrary in the sense that THC is 167, cocaine is 200, and methamphetamine is something else. So I think what the Court was talking about when it says the guidelines are what they are is kind of going to this argument that this Court has addressed several times in the Miller and Mondragon-Santiago line of cases,  She thought she had the authority to do something about this ratio. Why would she say that it's arbitrary, it doesn't make any sense to me or to anybody, and then thinking she had the authority to do something about it did nothing? It felt like her hands were tied. I think the judge... She didn't quite say it's arbitrary and it doesn't make any sense. She says the guidelines to... The Court acknowledges that the ratios in the sentencing guidelines are often arbitrary and present a relative. By converting everything to marijuana, they seek to outline the relative harm. I think she's talking about, in one sense, where did we get 167? Well, you know, why not a million? Well, because when they're not arbitrary, it's because THC is 167, cocaine is 200, methamphetamine is something else, LSD is something else. So they're arbitrary in the sense... The question to the expert was, where do we get 167? And both experts said, I don't know. I mean, I can't point you to a study that says synthetic THC is 167 times stronger than the leafy green stuff. So what the Court says is, yeah, they're arbitrary, but they seek to outline the relative harm. ...argument that counsel opposite makes that the District Court clearly did not understand the Supreme Court giving it the authority to vary and misread the Supreme Court case. I would disagree. Number one, as the Court pointed out, there's no question the Court's aware of Kimbrough. There's no question the Court read Kimbrough. This is not Burns, the case discussed in both briefs, where Kimbrough was decided after the Court sentenced the defendant. That's not this case. Kimbrough was decided almost seven years before sentencing in this case, and it was extensively briefed. When you look at Mr. Sadow's brief, all of the briefs filed by defense counsel in this case, and the government's response, the government never took the position that a Kimbrough-type variance was unavailable as a matter of law because it only applied in crack cases. The government took the position that, you know, this was a good sentence and that a variance was not warranted because of the dangerousness of AM 2201. But the government never took the position that a Kimbrough variance wasn't warranted. And so all of this was extensively briefed. The government never took the position that a Kimbrough variance was not warranted here? No, the government clearly took the position it wasn't warranted. The government didn't take the position that Kimbrough didn't apply, that Kimbrough only applied in crack cases, that the Court had no discretion in this particular case under Kimbrough. How did the government urge the Court to read Kimbrough? The government's argument on the Kimbrough variance was basically directed to the fact that this is a dangerous drug. AM 2201 is a dangerous drug. It's at least as dangerous... You know, I guess that they're good for it, Judge, that this is a good sentence because AM 2201 is a very dangerous drug. When you read the government's response to the defense attorneys' or the defendants' filings on Kimbrough, particularly Mr Malone's filing on Kimbrough is the most detailed, the government's response is this is a dangerous drug and it details all of these sorts of, you know, people die and they commit suicide and they have overdoses and they have psychosis and this is a very dangerous drug. You know, again, this refutes the defendants' argument that, well, you know, this is not so bad, this is really no worse than marijuana and look how high the sentence is in comparison to marijuana because that's the heart of their variance argument is that, you know, this stuff is... ...suggested to the court that it did not have the authority to vary the analog. The government did not have the authority under Kimbrough to vary? The court did not. No, no. No, we argued that a very... They could change the analog and the conversion rate at any time they wanted to on... No, Judge, because that would affect the calculation of the guideline range. What's your understanding of Kimbrough's discretion? Well, that the court can vary from the guideline range based on a policy-based disagreement with the guidelines, but that doesn't mean that you don't calculate the guidelines. Not a discretion to disregard the consequences of the numerical calculations, but to depart downward from that result. Do you agree Kimbrough is simply authorizing the court to depart downward from what the result of the calculation would be or simply to disregard the whole analog process? No, I think it's the first, Judge. I think the question you asked counsel earlier was something about does it affect the calculation or a normative determination afterwards? And I think it's the latter. Kimbrough makes clear the district court... Nothing relieves the district court of the obligation to calculate the guidelines. And so... This court could not possibly disregard the analog that it chose, I mean, in connection with the conversion rates that are provided in the guidelines. Maybe I'm not understanding your question, Judge. You have to calculate the guidelines using what's in the guidelines. Once you do... You mean the conversion rates? Yes. So my position is... And I know it's just a district court... They cannot just... Well, I mean, it's what you just said. Right. They cannot disregard the conversion rates. But then... But they can depart downward. Absolutely. Disregarded in the practical sense, the real sense, that you don't have to sentence them on that basis. That's exactly right. So it's a two-step thing. We calculate and then the district court can say, Well, you know, this comes out under the guidelines as a level 38. That's way too high because I don't think this stuff is so bad. Or I think that this is... The 167 has no basis. So you're not changing the manner in which the guidelines are calculated, but you are, as Judge Higginbotham points out, changing the result. And this is exactly the argument that was presented to a district court in the Middle District of Alabama. It's a case I cite in my brief because it's dead on. It was an analog case in which there was an issue on potency, that the unlisted substance was not as potent as the listed substance, and so the defendant wanted the district court to apply a different ratio. And the district court, I think correctly, said, No, I calculate the guidelines using the ratios supplied by the guidelines, and then that second question is left for a variance. And I think that's what the court had in front of it, and the case law in this circuit, and in every circuit, is extensive on the fact that the court never has to vary. It doesn't have to disagree, and it doesn't have to vary. I also contend that the district court misapprehended its range of authority to downward depart for substantial assistance on 5K1. The original factors of a, of a, of a, whatever it was, Judge Jones's opinion, and what. The DeSalle case, Your Honor, on the non-assistance-related factors. It's the government's position, and again, I think maybe the best authority for this is the Jacobs case that's heavily relied on in Malone's reply brief, supporting his argument that there's a difference between a variance and a departure, or a deviation and a departure. Jacobs, that's the Jacobs case, Jacobs says that guideline sentencing, it's a 2011 case, post-Booker, says it takes place in three steps. The court calculates the guidelines, the court considers specific offender characteristics, and available grounds for departure under the guidelines, so the 5K and the 5H categories, and then applies the 3553A factors to all of it. So it's our position that you have to read DeSalle. DeSalle is an unusual case. It was a government appeal where the court departed to a greater extent on grounds other than assistance, and in Judge Jones' opinion in DeSalle, this court reversed, saying, no, no, a 5K departure is meant to address assistance-related factors only. And I would suggest to this court, as we do in our brief, and many other circuits have recognized as well, that that's a one-way ratchet. The district court always has the authority to limit the extent of a departure to account for valid 3553A considerations. That's what actually happened in this case, as I understand it. And that's exactly what happened in this case, Your Honor. The district court conducted sentencing in two phases. There was a sealed 5K proceeding where the court received evidence. Was there ever a ruling on the 5K motion? There was a ruling in the sense that the court says, in the sealed proceeding, I grant the government's 5K motion. Then later, when we get to sentencing, the court basically pronounces a bottom-line sentence. If you're asking me, did the judge say, I'm giving you 5K? What did the motion say? Did the motion specify the specific months that it wished? The government filed a generic motion and then a more detailed memo. The court granted it. Granted it. No, granted it not to the extent recommended by the government. I think that after Green was sentenced, his lawyer asked, as I understand it, asked the judge a question. The judge responded to that. He said, ask him, why would the extent of the 5K-1 departure was less than even the government recommended? Because the government had recommended a departure for substantial assistance, as I understand it, and the judge didn't buy that. Her reply to that was that, well, I'm struck by the harm of this overall thing, et cetera, et cetera. There's no question that the district court tempered the extent of the departure in this case in light of 3553A factors that have nothing to do with assistance. She looked at the relative culpability of the defendants relative to each other. She looked at the... She says, I look at their relative cooperation, the value of their relative cooperation. Pardon me? I think it does, Your Honour, because I think DeSalle is about calculating the... First of all, DeSalle is about how far the court can go down. So I would suggest you hold DeSalle to its facts. Yes. The district court is authorized to depart downward for substantial assistance, but then, having done that, it can't throw in other factors and take it further down. That, I think, is DeSalle. And I cited a case in my 28J letter, Alvarez, which was decided before DeSalle, and it's a pre-Booker case that basically says once the court validly decides to depart, and I think that's where you reconcile Alvarez and DeSalle, if this court's inclined to do so, that validly decides to depart. I think DeSalle was all about a downward departure on the basis of factors other than substantial assistance. Alvarez talks about once the district court validly decides to depart, meaning considers valid factors in making the departure decision, then there's essentially no limit on what it could consider after that. And that's what the other circuits talk about, tampering the departure in terms of 3553A factors. What the district court should do, to be clear about it, is to rule on the 5K assistance that the government makes, and then, after it rules on that, turn to the 3553 factors. And it didn't do that in this case. It just jumbled them all together. And that's why I ask if there was ever actually a ruling on the government's motion for additional assistance, because the court did say, in kind of a rambling way, that the defendants didn't deserve any special assistance, any special consideration for the assistance that they rendered. Your Honour, may I briefly respond? My red light is on. Okay. The court did rule on the 5K. At the very end of the sealed 5K hearings, it says, I grant the 5K motion. Then later, at the open sentencing hearing, it says, I'm granting a 30% departure instead of the government's requested 50% departure. So there is a ruling to that extent. Thank you, Your Honour. Your Honour, on the 5K1.1, the factors that are supposed to be considered by the court are never even mentioned. We have a sealed hearing in which the court does rule that it's going to grant the motion without any indication whatsoever what the court is going to actually do in the departure, extent of departure. We go into sentencing. Green goes first, then Malone. Handwriting is on the wall. 30% from the top of the guidelines. Not any mention, again, of the factors that are outlined in 5K1.1. Just 30% from top of the guidelines. The government said 50% from the bottom of the guidelines. Difference? 49 months without a word being said about substantial assistance. 50% is... 50% of 117 months, or 50% of... 50% of 117... No, 50% of 135 versus 30% of 168. 49 months, approximately. Do you agree that the other circuits that have considered this have held that non-assistance-related factors can be considered to limit the extent of a 5K1.1 departure? I do, but I don't, because this court and the other circuits have made it clear how that comes into play. The government, in a letter to the court just recently, in fact, in a per curiam opinion that Judge Jolly was involved in, and I realize it doesn't have precedential value, but the government did reference that, this court says, in reference to DeSalle, noting that a district court could consider other factors to determine the amount and significance of the assistance provided as long as the ultimate extent of the departure was based solely on assistance-related factors. Ours is certainly not based on assistance-related factors. There's nothing in what the court said on the record that even spoke to assistance-related factors. It was other matters outside 5K1.1 and substantial assistance which guided the court on its 30% from the top of the guidelines. And there's an extensive difference between... The court told us at the time of the 5K, that 1.1 sealed hearing, that that was all for that hearing, that was it. We're not going to be arguing that again when we get into sentencing. 3553A was argued at sentencing. 3553A encompasses downward variances, encompasses Kimbrough. Those were the arguments made, not 5K1.1. The court never speaks to variance, never speaks to 3553A, speaks only to the 30% non-assistance-related factors. That's procedurally unreasonable. That's the way it's called. The entire sentence is substantially unreasonable. Thank you. Thank you, Mr. Sadar.